```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
BIBLIOTECHNICAL ATHENAEUM, American                                    :
University of Beirut                                                   :
                                                                       :
                            Plaintiff,                                 :
                                                                       :                20-cv-4068 (LJL)
            -v-                                                        :
                                                                       :                OPINION AND ORDER
AMERICAN UNIVERSITY OF BEIRUT,                                         :
                                                                       :
                            Defendant.                                 :
                                                                       :
-----------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/19/2021

LEWIS J. LIMAN, United States District Judge:

Congress has long, by Federal law, prohibited United States persons from participating in boycotts of companies doing business in specifically-identified countries. *See* 50 U.S.C. § 4842 ("the President shall issue regulations prohibiting any United States Person, with respect to that person's activities in the interstate or foreign commerce of the United States, from . . . [taking certain enumerated actions] with the intent to comply with, further, or support any boycott fostered or imposed by any foreign country, against a country which is friendly to the United States . . ."). The United States Department of State also has identified Israel as among those countries whose corporations a United States person may not boycott. *See* 48 C.F.R. § 652.225-71 (identifying the "Boycott of Israel by Arab League countries" as a prohibited boycott under federal anti-boycott law). Those laws have been in place in one form or another since 1977.[1]

---

[1] *See* Bureau of Industry and Security, Office of Antiboycott Compliance, *Antiboycott Authorities (History)*, available at https://www.bis.doc.gov/index.php/enforcement/oac#:~:text=McCain%20National%20Defense%20Authorization%20Act,boycott%2Drelated%20administration%20and%20enforcement ("During the late 1970s the United States adopted several authorities that sought to counteract the participation of U.S. persons in other countries' economic boycotts or restrictive trade practices. The 1977 amendments to the Export Administration Act of 1969 targeted certain activities by U.S. persons taken in furtherance of an unsanctioned foreign boycott. These amendments formed the basis of Section 8 of the Export

This case raises no question under these federal anti-boycotting provisions. It raises a distinct and independent question of federal law: whether Title VI of the Civil Rights Act of 1964, which in part prohibits entities receiving federal funds from engaging in discrimination on the basis of national origin, also extends its protection to companies based on the country in which they are incorporated and prohibits those who receive federal funds from engaging in discrimination against a company based on its country of incorporation. It also raises questions about the extraterritorial reach of Title VI and the scope of State and City anti-discrimination and anti-boycott laws.[2]

Bibliotechnical Athenaeum ("Plaintiff" or "BA"), which is incorporated in Israel but has its principal place of business in New York, brings this action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as New York State and City law, complaining that it was the victim of discrimination based on national origin when the American University of Beirut ("Defendant" or "AUB"), which is based in Lebanon but receives federal funds, denied BA access to its virtual career fair and career services system allegedly on account of its incorporation in Israel. Dkt. No. 1 ("Complaint" or "Compl.") ¶ 1.

AUB now moves to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(6) for the failure to state a claim for relief. Dkt. Nos. 12-13. AUB also asks the Court to

---

Administration Act of 1979. . . . Enacted on August 13, 2018 . . . the Anti-Boycott Act of 2018 . . . . provides the current statutory basis for the [Office of Antiboycott Compliance's] boycott-related administration and enforcement.").

[2] New York's Lisa Law, which was enacted in response to the Arab Boycott of Israel, makes it unlawful "for any person to boycott or blacklist, or to refuse to buy from, sell to or trade with, or otherwise discriminate against any person, because of . . . , [the] national origin . . . of such person." N.Y. Executive Law 296(13). As stated below, the Court declines to exercise supplemental jurisdiction over this claim.

decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), if it dismisses the federal claim and to disqualify BA's counsel.  For the reasons stated, the Court concludes that Title VI does not prohibit discrimination against a company on the basis of its country of origin and that Plaintiff's federal claim therefore must be dismissed.  The Court declines to exercise supplemental jurisdiction over Plaintiff's New York State and New York City law claims.

**BACKGROUND**

BA is a corporation in Israel with its principal place of business in New York, New York.  Compl. ¶ 1.  It claims that its "primary purpose is to fight against anti-Israeli discrimination."  *Id.*  AUB is an accredited research university located in Beirut, Lebanon.  *Id.* ¶ 8.  It has a New York office where is "regularly holds activities," *id.*, and is chartered by the New York Board of Regents and accredited by the Middle States Commission on Higher Education.  *Id.* ¶ 7.

The lawsuit grows out of a "virtual career fair" AUB held for its students in late 2019.  *Id.* ¶ 10.  The career fair was advertised as "a great opportunity [for employers] to attract the best AUB students and professional alumni wherever they are around the world," and AUB touted "[t]he event [as] offer[ing] amazing features such as a virtual booth, CV search, direct chat with candidates, webinars, posting vacancies and interviewing all from the comfort of [employers'] office[s] without the cost and hassle of travel."  *Id.* ¶ 11.  In addition, AUB offers normal career services to potential employers, including American employers, who wish to recruit AUB students to perform services in Lebanon, New York, or elsewhere.  *Id.* ¶ 14.

In late 2019, BA signed up for AUB's career services portal in order to recruit a paid intern as well as to participate in the virtual career fair.  *Id.* ¶ 15.  It claims that it intended to recruit a paid intern "to assist with promoting commercial activity to promote international trade and goodwill."  *Id.* ¶ 16.  The registration form includes an acknowledgment of the Terms and

Conditions of AUB's Career Portal, including "that any vacancy submission will be subject to the prior approval of AUB" and that AUB reserved the right to cancel any registration or job post at any time.  Dkt. No. 16-1 at 3.  Its registration was initially accepted by AUB and it was allowed to post an advertisement with AUB's career services computer system and to begin the process to register for the virtual career fair notwithstanding its New York address.  Compl. ¶ 17.  AUB subsequently asked to schedule a phone call with BA but BA declined and instead replied: "Thanks for your e-mail.  By the way, Bibliotechnical is an Israeli organization.  Is this a problem?"  *Id*. ¶¶ 17-18.  After BA informed AUB that it was an Israeli corporation, AUB locked it out of the computer system and refused to communicate further regarding participation in the virtual career fair, denying BA access to that fair.  *Id.* ¶ 18.

## PROCEDURAL HISTORY

BA filed this lawsuit on May 27, 2020, alleging that AUB's refusal to permit it to participate in the virtual career fair and denying it access to AUB's career services platform based on its incorporation in Israel constitutes discrimination on the basis of national origin in violation of Title VI of the Civil Rights Act of 1964.  *Id*. ¶¶ 33-37.  It also alleges that the same conduct violates the New York City Human Rights Law, *id*. ¶¶ 22-27, and the Lisa Law of 1976, *id*. ¶¶ 28-32; *see supra* n. 2.  AUB moved to dismiss the complaint on August 21, 2020.  Dkt. No. 13.  BA filed its memorandum in opposition to the motion to dismiss on September 20, 2020, Dkt. No. 17, and BA filed its reply memorandum in further support of the motion to dismiss on October 12, 2020, Dkt. No. 18.  The Court heard oral argument on March 11, 2020.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

4

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

### A.   Title VI

Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d.[3] The statute "s[eeks] to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979);

---

[3] Unlike Title VII, Title VI does not refer to discrimination because of sex or religion. *Compare id*., *with* 42 U.S.C. § 2000e-2(a) (making it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin.").

5

*see Sternberg v. U.S.A. Nat. Karate-Do Fed'n*, 123 F. Supp. 2d 659, 664 (E.D.N.Y. 2000) (citing *Cannon*, 441 U.S. at 703). In essence, the statute "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of the funds," *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 286 (1988), and it provides an "administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination," *Cannon*, 441 U.S. at 696.

The Supreme Court has held that Title VI creates a private right of action to sue for intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001) ("private individuals may sue to enforce . . . Title VI and obtain both injunctive relief and damages."); *see Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 133 (E.D.N.Y. 2010) (quoting *Alexander*, 532 U.S. at 279). "In order to establish a Title VI violation, a plaintiff must show, through specific factual allegations, that '(1) the defendant discriminated on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action.'" *HB v. Monroe Woodbury Cent. School Dist.*, 2012 WL 4477552, at *14 (S.D.N.Y. Sept. 27, 2012) (quoting *Faccio v. Eggleston*, 2011 WL 3666588, at *9 (N.D.N.Y. Aug. 22, 2011)).

The fact that BA is a corporation and not a human being does not itself deprive it of the protections of Title VI or permit a federally-funded entity to discriminate against it on the basis of race, color, or national origin. Forty years ago, Judge Friendly addressed this question in the context of a claim brought by a not-for-profit tax-exempt organization whose purpose was to produce theatrical and artistic productions "to reach and involve the Black and Hispanic communities," *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 703 (2d Cir. 1982), *cert. denied* 459 U.S. 857 (1982), and that "was established for the very purpose of

6

advancing minority interests," *id.* at 706.  Distinguishing language in an earlier Supreme Court case, *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977), Judge Friendly held that a corporation could have an imputed racial identity and—when it was discriminated against on the basis of that imputed identity—could bring a Title VI claim for relief.  A City surely could not under Title VI deny "contracts to a construction company because it was owned by blacks."  *Hudson Valley*, 671 F.2d at 706.  The court held that the Supreme Court did not intend to "deny standing to the corporation because it 'has no racial identity and cannot be the direct target' of the discrimination, while at the same time . . . deny[ing] standing to the stockholders on the sound ground that the injury was suffered by the corporation and not by them."  *Id.*  The court concluded, "[w]hen a corporation meets the constitutional test of standing, . . . prudential considerations [do] not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the corporation was founded to achieve."  *Id.*[4]

Following *Hudson Valley*, the circuit courts that have considered the issue uniformly have held that a corporation has a claim under Title VI where it is the victim of prohibited discrimination by a federally-funded program.  *See Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 714 (4th Cir. 2014) ("several other federal appellate courts have . . . declined to bar on prudential grounds race discrimination claims brought by minority-owned corporations that meet constitutional standing requirements.") (citing *Hudson Valley* and cases in the First, Seventh, Eighth, Ninth, Tenth, and DC Circuits); *Domino's*

---

[4] What the Second Circuit in *Hudson Valley* described in terms of "prudential standing" is more commonly understood in contemporary jurisprudence to implicate the "zone of interests" of a statute, by which a court "determine[s] . . . whether a legislatively conferred cause of action encompasses a particular plaintiff's claim," i.e. whether a "particular class of persons has a right to sue under th[e] substantive statute" at issue.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (internal quotation marks and citation omitted).

7

*Pizza, Inc. v. McDonald*, 546 U.S. 470, 473 n. 1 (2006) (recognizing that "the Courts of Appeals to have considered the issue have concluded that corporations may raise [42 U.S.C.] § 1981 claims" for injuries due to race discrimination) (citing *Hudson Valley*, 671 F.2d at 706).

To determine whether a corporation was subjected to discrimination based on its imputed racial identity, courts have looked to the ownership of the corporation and the identity of its shareholders, directors, officers and employees. Where a corporation is discriminated against because of the race of those constituents, the corporation has a cognizable claim under Title VI. *See Hudson Valley*, 671 F.2d at 706 (endorsing "[t]he principle that a corporation may assert equal protection claims when it alleges discrimination because of the color of its stockholders"); *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1059 (9th Cir. 2004) (a corporation had an "imputed racial identity" where in order "to receive certain governmental benefits, [it] was required to be certified as a corporation with a racial identity" and "it allege[d] that it suffered discrimination because all of its shareholders were African-American"); *Carnell Const. Corp.*, 745 F.3d at 715 ("[A] minority-owned corporation may establish an 'imputed racial identity' for purposes of demonstrating standing to bring a claim of race discrimination under federal law."). In that instance, the discrimination directed immediately at the corporation is based on the racial identities of its constituents and experienced by them on account of their racial identities. In Judge Friendly's words, the fact that the individuals themselves cannot bring a claim because, in the first sense, "the injury was suffered by the corporation and not by them," should not relieve the defendant of liability for its intentional racial discrimination. *Hudson Valley*, 671 F.2d at 706. Nor should it deprive the federal government of the right to strip the defendant of federal funding on the basis of that discrimination.

8

Alternatively, *Hudson Valley* suggested that, in some circumstances, a corporation can have an imputed identity based on its mission and activities. In *Hudson Valley*, the plaintiff organization "was established for the very purpose of advancing minority interests," and Judge Friendly observed that a corporation "should [not] lack standing to complain of discrimination because of its activities *or* stock ownership based on racial grounds." *Id*. (emphasis added).

There is no reason why, if a corporation can have an imputed racial identity, it cannot also have an imputed national origin identity. Title VI proscribes in equal terms discrimination on the basis of race, color *and* national origin. Each is proscribed if directed against a person in the United States. And, a "person" is defined under federal law to include a "corporation[]." 1 U.S.C. § 1.[5] Individuals experience discrimination on the basis of their national origin, as the 1964 Congress recognized and individuals can also occasionally do business with and contract with federally-funded institutions in the corporate form. If discrimination by a federally-funded program against a corporation with a racially-imputed identity violates Title VI, so too does discrimination against a corporation with an identity formed on the basis of national origin. After all, individuals who suffer discrimination on the basis of national origin feel the sting just as individuals who suffer discrimination on the basis of race do—even if the discrimination is directed most immediately at the corporation of which they are constituents. In either instance, it is "hard to believe" that Congress intended to "deny standing to the corporation . . . while at the same time" the individuals at whom the discrimination was targeted would lack standing "on grounds that the injury was suffered by the corporation and not by them." *Hudson Valley*, 671 F.2d at 706.

---

[5] *See also Hudson Valley* 671 F.2d at 705 (observing that Title VI "says that 'no person in the United States shall, on the ground of race, color, or national origin . . .' [and not] 'no person in the United States shall, on the ground of his race, color, or national origin'").

9

Those propositions, however, only get BA so far. They do not establish its claim to relief. "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973); *see United States v. Brennan*, 650 F.3d 65, 134 (2d Cir. 2015) (citing *Espinoza*); *cf.* 29 C.F.R. § 1606.1 (Equal Employment Opportunity Commission definition of national origin discrimination as broadly including discrimination based on "an individual's, or his or her ancestor's, place of origin . . . [or] the physical, cultural or linguistic characteristics of a national origin group"). It "does not include citizenship or alienage." *Shah v. Wilco Sys., Inc.*, 76 F. App'x 383, 384 (2d Cir. 2003) (citing *Espinoza*, 414 U.S. at 95); *see Backer v. USD 30 Billion MTN Programme*, 2017 WL 6387732, at *8 (S.D.N.Y. Sept. 30, 2017) ("prohibitions on national origin discrimination do not prohibit discrimination on the basis of citizenship or nationality."). The Supreme Court made that principle clear when it decided *Espinoza v. Farah Manufacturing Co.*, which addressed a claim, brought under Title VII of the Civil Rights Act of 1964, that the plaintiff-appellant had been refused a job on grounds that she was not a Untied States citizen but rather a lawful resident alien who was born in and remained a citizen of Mexico. 414 U.S. at 88. Examining the legislative history of the Civil Rights Act of 1964, as well as the federal government's own contemporaneous practice of excluding non-United States citizens from entering competitive examination for federal employment, the Court concluded that Congress could not have intended for a prohibition of "national origin" discrimination to cover discrimination based on citizenship or alienage. *Id*. at 91-92. A federally-funded program thus can discriminate against an individual based on the country in which she chooses to live or establish citizenship.

That same principle is fatal to BA's claim here.  BA bases its Title VI claim not on the national origin of the individuals who are its owners, founders, directors, or employees but on the corporation's country of incorporation.  Compl. ¶¶ 2, 24.  Plaintiff claims that it is "an Israeli corporation with a principal place of business in the State of New York," that it is "of Israeli citizenship and national origin" and that it has "Hebrew in its founding documents."  *Id*. ¶¶ 2, 24.  It alleges that it registered for AUB's career services portal but was locked of AUB's system after an email correspondence in which it stated "Bibliotechnical is an Israeli organization.  Is this a problem?"  Compl. ¶¶ 15-19; Harb Decl. Ex 1.

That country of incorporation, however, only bears a faint—if any—relationship to the *national origin* of its owners, directors, or employees.  Those owners, directors, or employees may be Israelis.  They may not be.  If they are Israelis, they may not be of Israeli national origin.  They may be immigrants to that country.  If the owners and directors are not Israeli citizens, they may be of Israeli national origin—persons whose ancestors were born in Israel.  Or they may not be.  In any event, it cannot be said that discrimination against a corporation incorporated in Israel is discrimination based on national origin any more than it can be said that a federally-funded institution that refuses to do business with a corporation incorporated in Ireland, or Brazil, or Germany, or Russia is discrimination against persons of the national origin of those countries.

The country in which a company chooses to incorporate is not, and is not alleged to be, a function or an indication either of the national origin of its constituents or of its mission.  Companies choose to incorporate in a particular jurisdiction for any number of reasons having nothing whatsoever to do with the national origin of their constituents or their race or color.  Some countries may have more relaxed standards with respect to the duties of officers and directors (and whether shareholder derivative actions can be brought) than others.  *See, e.g.*, *In re*

11

*BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 311 (S.D.N.Y. 2007) ("English law provides a narrowly tailored cause of action for a shareholder to sue on behalf of a corporation . . . a shareholder may not bring a derivative action for 'wrongs' to the company if those wrongs are capable of ratification by a majority of shareholders—and notably, breach of fiduciary duty is capable of ratification under English law—unless an exception applies."). A corporation may choose to incorporate in a particular location because of the favorable tax treatment it will receive in that location. *See, e.g.*, *Finch v. Marathon Sec. Corp.*, 316 F. Supp. 1345, 1347 (S.D.N.Y. 1970) ("[Defendant corporation] was organized under the laws of Bermuda . . . predominantly to secure certain tax advantages."). Or because it will receive favorable treatment under trade treaties. *See, e.g.*, *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 330 (S.D.N.Y. 2009) ("[U]nder the [Friendship, Commerce, and Navigation] Treaty Japanese companies operating in the United States are authorized to bring in Japanese nationals to run the company's U.S. business affairs, and U.S. companies operating in Japan may do the same, without running afoul of any laws of the host country."). Or because it is easier or less expensive to incorporate in that location or the location permits it greater confidentiality and provides greater data protection for its documents and information. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2010 WL 3420517, at *9 (E.D.N.Y. Aug. 27, 2010) ("As the plaintiffs point out, the European rules exhibit a greater solicitude for confidentiality than the equivalent United States procedures."). A company may even choose to incorporate in a particular country as a show of support for that country. There is nothing in Title VI that suggests that a federally-funded entity is required to give equal treatment to a company that chooses to incorporate outside the United States as to one that is incorporated

inside the United States, or that accords the protection of federal law to a company simply because it chooses a foreign site to incorporate rather than the United States.

Plaintiff does allege that its "primary purpose is to fight against anti-Israeli discrimination." Compl. ¶ 16. But, even accepting that a corporation can have a national origin identity based on its mission, *see Hudson Valley*, 671 F.2d at 706, there is no necessary or sufficient relationship between support of a country and support of persons who trace their ancestry to that country. Persons of Israeli heritage (or Israeli national origin) may support the State of Israel and oppose discrimination against it. They may also oppose that State and favor discrimination against it. And persons who are not of Israeli heritage may oppose discrimination against the State of Israel just as they may favor discrimination against it. To embrace the notion that only a corporation whose identity is based on Israeli national origin can be a supporter in the fight against anti-Israeli discrimination is to embrace the very national origin stereotyping that the federal anti-discrimination laws were intended to prevent. In any event, BA's identity as an organization intended to fight discrimination against the State of Israel is in no way equivalent to the identity of the Hudson Valley Freedom Theater in the *Hudson Valley* case, whose mission was to "'produce theatrical and artistic productions in Orange County and the Mid-Hudson area which particularly reach and involve the Black and Hispanic communities,' and 'which . . . reflect the cultural needs, aspirations and creativity of the Black and Hispanic communities of the Mid-Hudson area.'" *Hudson Valley*, 671 F.2d at 703.[6]

---

[6] Moreover, even if Plaintiff's assertion were that its mission is to fight against discrimination against individuals of Israeli national origin, BA makes no claim that it was excluded because of its mission, or indeed that AUB even knew what its mission was. *See HB*, 2012 WL 4477552, at *14 (Title VI prohibits *intentional* discrimination); *cf. Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("discriminatory intent cannot be inferred . . . from circumstances unknown to the defendant.") (age discrimination context). Rather, Plaintiff alleges that AUB excluded it because it is an "Israeli corporation," and "as a result of [AUB's] apparent illegal boycott of

13

There is some ambiguity whether the principles of *Hudson Valley* and its progeny concern statutory standing or the nature of the discrimination Title VI proscribes—i.e., whether discrimination that is directed at a corporation that does not have a racial identity or identifiable racial mission is not actionable because the corporation who is its victim is outside the zone of interests protected by Title VI, *see Lexmark*, 572 U.S. at 127, or is not actionable because the discrimination is not on the basis of the victim's race.  *See Gersman v. Grp. Health Ass'n, Inc.*, 931 F.2d 1565, 1567-68 (D.C. Cir. 1997) (holding that "the determination of whether a corporation has a racial identity" is not determinative of statutory standing because in some circumstances an individual "need not be a member of a protected minority in order to suffer harm from discrimination").  The Court need not decide that issue here.  To the extent BA could be said to have statutory standing because denial of access to the job fair caused it injury, there is no well-pled allegation that the denial was based on *national origin* as opposed to BA's country of incorporation.

In light of the Court's disposition, it need not address the questions of whether Title VI has extraterritorial reach or whether the alleged conduct is in fact extraterritorial.  *See RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2101 (2016) (to determine if extraterritoriality doctrine bars a claim, a court first asks "whether the presumption against extraterroriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially . . . [i]f the statute is not extraterritorial, then at the second step [the court] determine[s] whether the case involves a domestic application of the statute, and [the court] do[es] this by looking at the statute's 'focus.'") (citing *Morrison v. Nat. Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013)).

---

Israel."  Compl. ¶¶ 1; 18.  Such conduct is not prohibited by Title VI.

The parties each present substantial arguments on this issue. Plaintiff argues that that the Court need not reach beyond a "a domestic application of the statute," *RJR Nabisco, Inc.*, 136 S. Ct. at 2101. Title VI is, in the first instance, a funding statute. It reflects Congress's concern about the programs to which federal funding is extended. Its territorial reach is limited by the fact that it reaches discrimination only against a person "in the United States" and by the fact that the only entities it addresses are those that receive federal funding. 42 U.S.C. § 2000d; *see Gebser*, 524 U.S. at 286. Plaintiff argues that if a program that receives federal funding discriminates on the basis of race against a person "in the United States," that conduct should not be outside the reach of Title VI simply because the entity receiving the federal funding is outside the United States or the decision-making is made outside the United States. The Department of Justice should be able to reach that conduct in the exercise of its enforcement authority, and—because the language of the statute does not distinguish between governmental enforcement and private enforcement—so too should a private plaintiff. *see United States v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013) (applying the holding of *Morrison v. Nat. Austl. Bank Ltd.*—which, in the context of a private action, determined that Section 10(b) of the Securities Exchange Act of 1934 did not have extraterritorial reach—to a government enforcement action); *id.* ("The presumption against extraterritoriality is a method of interpreting a statute, which has the same meaning in every case."); *see Morrison*, 561 U.S. at 254.

For its part, Defendant argues that Congress has made clear when it intends a statute to apply extraterritorially as it did when it provided for such extraterritorial application under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; *see* 29 U.S.C. § 623(h)(1) ("If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice

15

by such employer"). That statute also created a defense insulating employers from liability for "practices involv[ing] an employee in a workplace in a foreign country" where compliance with the ADEA "would cause [the] employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located." 29 U.S.C. § 623(f)(1); *see Morelli v. Cedel*, 141 F.3d 39, 42-43 (2d Cir. 1998) (discussing the foreign law exception). Title VI neither states on its face that it applies extraterritorially nor provides an answer to the question posed to AUB here—what to do when United States and foreign law apparently conflict. AUB argues that the courts try to avoid such conflict with foreign law and so the Court here should interpret Title VI not to apply the conduct at issue by AUB. AUB also argues that Plaintiff is not an intended beneficiary of any AUB program receiving federal funds, and there is no "logical nexus" between the events at issue and any federally funded program at AUB. *See Commodari v. Long Island Univ.*, 89 F. Supp. 2d 353, 378-79 (E.D.N.Y. 2000), *aff'd* 62 F. App'x 28 (2d Cir. 2003)).

Because the Court holds that BA has not pled that it possesses an imputed national identity, or that its treatment by AUB was the result of any unlawful discrimination under Title VI, it need not reach these issues.

### B. State and city law claims

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In determining whether to exercise supplemental jurisdiction under Section 1367(c), the Court "balances the traditional 'values of judicial economy, convenience, fairness, and comity.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). In "the usual case in which all federal-law claims are eliminated before trial . . . [these factors] will point toward declining to exercise

jurisdiction over the remaining state-law claims." *Id.* (quoting *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7); *see also Klein & Co. Futures v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."); *see, e.g.*, *Milord-Francois v. N. Y. Off. of Medicaid Inspector Gen.*, 2020 WL 5659438, at *24 (S.D.N.Y. Sept. 23, 2020) (declining to exercise supplemental jurisdiction over city and state law claims after dismissing Title VII claim). This is such a case. This case is in the early stages, and no discovery has been taken. Having dismissed Plaintiffs federal claim under Title VI, the Court declines to exercise supplemental jurisdiction over Plaintiff's New York State and New York City law claims.

## CONCLUSION

For the reasons stated, the motion to dismiss is GRANTED and the case is DISMISSED without prejudice to Plaintiff filing an amended complaint within thirty (30) days of this Opinion and Order. The Clerk of Court is respectfully directed to terminate all pending motions and to close the case, without prejudice to re-opening it upon filing of an amended complaint within thirty (30) days.

SO ORDERED.

Dated: March 19, 2021
New York, New York

LEWIS J. LIMAN
United States District Judge