David Abrams, Attorney at Law
305 Broadway Suite 601
New York, New York 10007
Tel. 212-897-5821 dnabrams@gmail.com

United States District Court
Southern District of New York
_____

|  |  |  |
|---|---|---|
| | ) | |
| Bibliotechnical Athenaeum, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20cv4068(LJL) |
| - against - | ) | |
| | ) | |
| American University of Beirut, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**<u>Memorandum of Law in Opposition to Motion to Dismiss</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ...................................................................................2

FACTS AND PROCEDURAL HISTORY ...............................................3

ARGUMENT ..........................................................................................6

   I.   The Civil Rights Act of 1866 Prohibits Citizenship
      and Alienage Discrimination...........................................................6

   II.  Bibliotechnical Is Within the Zone of Interests
      Protected by Section 1981..............................................................8

   III. The Civil Rights Act of 1866 Prohibits Discrimination
      Against Specific Nationalities.......................................................10

   IV.  There is No Illegality Defense Here ...........................................11

   V.   The Law Applies Even if the Discriminatory
      Decisions Took Place In Lebanon ...............................................13

   VI.  AUB's Remaining Arguments Lack Merit ...............................14

   VII. Defendant's Motion to Disqualify is Premature at Best ...................15

CONCLUSION .......................................................................................16

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Conboy*, 156 F.3d 167  (2d Cir. 1998) ........................... 2-3,6-7,8, 11-12

*Bibliotechnical Athenaeum v. National Lawyers Guild*,
Case No. 653558/2016 (Sup. Ct. N.Y. Cty. Mar. 30, 2017) .........................................6

*Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 571 (3d Cir. 2002)...........................9

*Hardwick v. Auriemma*, 116 A.D.3d 465 (1st Dept. 2014) ........................................ 13

*Hoffman v. Parade Publications*, 15 N.Y.3d 285 (2010)........................................... 13

*Interpharm Inc. v. Wells Fargo Nat'l Bank*, No. 08 cv 11365
(S.D.N.Y. Mar. 25, 2010) ................................................................................. 15

*Juarez v. Northwestern Mut. Life Ins. Co.*, 69 F. Supp.2d 364 (S.D.N.Y. 2014)...... 10-11

*Murray v. Metropolitan Life Insurance Co.*, 583 F.3d 173 (2d Cir. 2009)................... 15

*Ofori-Tenkorang v. American International Group, Inc.*,
460 F.3d 296 (2d Cir. 2006)............................................................................... 13

*People v. Washington*, 36 Cal. 658 (1869)........................................................... 7-8

*White Glove Staffing, Inc. v. Methodist Hospitals of Dallas*,
947 F.3d 301 (5th Cir. 2020) ............................................................................. 8-9

### Statutes & Rules

42 U.S.C. Section 1981 ............................................................. passim

31 C.F.R. 542.207 ......................................................................... 12

31 C.F.R. 542.405 ......................................................................... 12

New York City Human Rights Law Section 8-107(4)(a)(1)..................................... 15

## <u>Articles</u>

Jad Mouawad, *Kuwait Airways Drops Flight to Avoid Israeli Passengers*,
N.Y. TIMES, Dec. 18, 2015................................................................................. 11

Maurice Portley, *State Legislative Responses to the Arab Boycott of Israel*,
10 U. MICH. J. LAW REFORM 592 (1977) ............................................................ 15

Plaintiff Bibliotechnical Athenaeum ("Plaintiff" or "Bibliotechnical") respectfully submits this memorandum of law in opposition to the motion to dismiss of Defendant American University of Beirut ("Defendant" or "AUB").

## Introduction

The key issue presented by Defendant's motion is whether Bibliotechnical has corrected the problem identified in the Court's Opinion and Order of March 19, 2021 (the "Opinion").  In that Opinion, the Court distinguished between (1) national origin discrimination; and (2) discrimination based on "citizenship and alienage."  Opinion p. 10.  Holding that Title VI covers the former but not the latter, the Court dismissed the original Complaint in this matter.  *Id.*

Accordingly, Bibliotechnical has filed an Amended Complaint alleging discrimination based on the Civil Rights Act of 1866 (also referred to as Section 1981) which emphatically does cover discrimination based on citizenship and alienage.  As set forth in more detail below, the Civil Rights Act of 1866 was amended in 1870 for the express purpose of stopping discrimination against Chinese persons who were legally present in the California but who were not U.S. citizens.  Of course the situation here is closely analogous:  Bibliotechnical is an Israeli citizen which is legally present in New York.  The operative precedent, *Anderson v. Conboy*, 156 F.3d 167 (2d Cir. 1998) makes clear that these principles apply in the 20th century and beyond.

Further, as set forth in more detail below, the corporate Plaintiff would have standing to pursue this matter even if it lacked an Israeli identity:  It suffered harm directly as a result of the Defendant's unlawful discrimination and under applicable precedent this is sufficient.

2

Additionally, the Defendant in *Anderson* made basically the same argument as the Defendant here:  It claimed that prohibition on citizenship discrimination would require it to violate the law.  As discussed in more detail below, the Second Circuit has unambiguously rejected that argument.

### Facts & Procedural History

This matter arises from legal activism aimed to challenge the Defendant's illegal boycott of Israel.

As set forth in more detail below, the Plaintiff, an Israeli corporation, attempted to (1) participate in the virtual career fair offered by the Defendant; and (2) participate in Defendant's career services office by placing an advertisement.  This was done in full expectation that Plaintiff would be denied service and that Plaintiff would file a formal legal claim challenging the Defendant's illegal boycott of Israel.  As set forth in more detail below, this is exactly what happened.

Plaintiff Bibliotechnical Athenaeum ("Plaintiff" or "Bibliotechnical") is an Israeli corporation with a principal place of business in the State of New York, County of New York.   (Amended Complaint Para. 2).  Defendant American University of Beirut ("AUB" or "Defendant") is a New York educational corporation with its principal place of business in the State of New York, County of New York.  (Amended Complaint Para. 3).

AUB is an American University which is chartered by the New York Board of Regents and accredited by the Middle States Commission on Higher Education. (Amended Complaint Para. 7).  Although AUB's main campus is located in Beirut,

Lebanon, it also regularly holds activities in its New York office.  (Amended Complaint Para. 8)

Like most American universities, AUB also operates a career services office. (Amended Complaint Para. 9).  Also, in late 2019, AUB announced that it would be holding a "virtual career fair," which would allow potential employers all over the world to sign up for (and pay a fee between $700 and $1500) virtual booths which would allow them to recruit AUB students around the world.  (Amended Complaint Para. 10).

AUB described the event as follows:

Employers have a great opportunity to attract the best AUB students and professional alumni wherever they are around the world. The event offers amazing features such as a virtual booth, CV search, direct chat with candidates, webinars, posting vacancies and interviewing all from the comfort of your office without the cost and hassle of travel

Thus, AUB intended and expected employers to participate in the conference from outside of Lebanon.  Indeed, one of the leading participants in the conference -- American Creativity Academy -- is located in Kuwait. (Amended Complaint Para. 11, 12).

Thus, AUB's career fair would permit employers in New York to recruit AUB students in New York to work in New York.  (Amended Complaint Para. 13)  It would also allow New York employers to recruit AUB students in Lebanon to perform New York work remotely.  (*Id.*)  And indeed, AUB would have permitted the Plaintiff to do exactly that if it were not for the fact that Plaintiff is Israeli.  (*Id.*).  In addition to offering its virtual career fair event, AUB offers normal career services to potential employers, including American employers, who wish to recruit AUB students to perform services in Lebanon; New York; or elsewhere.  (Amended Complaint Para. 14).

In late 2019, Bibliotechnical signed up for AUB's career services portal in order to recruit a paid intern as well as to participate in the virtual career fair.  (Amended Complaint Para. 15).  Although the registration was not initially approved, Bibliotechnical sent a follow up email and in response, an AUB employee indicated that she would push for the registration to be approved.  (*Id.*)  Shortly thereafter, the registration (for the career services portal) was approved and Bibliotechnical was able to publish job listings.  (*Id.*)

Although Bibliotechnical is an Israeli entity, it is duly authorized to conduct business in New York.  (Amended Complaint Para. 16)    Further, although Bibliotechnical's primary purpose is to fight against anti-Israel discrimination, Plaintiff seriously intended to attend the virtual career fair and recruit a paid intern to assist with promoting commercial activity to promote international trade and goodwill.  (Amended Complaint Para. 16).  In other words, AUB's accusation that the attempted job placement was "fake" is a flagrantly false accusation.  It was no more fake than Oliver Brown's application to have his daughter accepted to an all-white school, knowing full well that the application would be rejected by the Topeka Board of Education.

Bibliotechnical's registration was initially accepted by AUB with no problem based on its address in New York.  (Amended Complaint Para. 17)  Bibliotechnical was allowed to post an advertisement with AUB's career services computer system and started the process to register for the virtual career fair.  (*Id.*)

Shortly thereafter, Bibliotechnical advised AUB's representatives that it was an Israeli corporation.  (Amended Complaint Para. 18).  Immediately after that, Bibliotechnical was locked out of the computer system and AUB's representatives

refused to communicate further regarding participation in the virtual career fair.  (*Id.*) This response was completely expected: AUB states in its own papers that its employees are prohibited from providing services to Israeli entities.  (Def. Memorandum of Law p. 19).

Bibliotechnical brought a similar action against the National Lawyers Guild in 2016.  *See Bibliotechnical Athenaeum v. National Lawyers Guild*, Case No. 653558/2016 (Sup. Ct. N.Y. Cty.) which action arose from the rejection of Bibliotechnical's attempt to place an advertisement in the annual dinner journal of the National Lawyers' Guild.  In that case, the Defendant's motion to dismiss was denied and ultimately the parties reached a consent judgment in which the Defendant was required to publish Bibliotechnical's advertisement and to refrain from future discrimination.  (*Id.* Dockets No. 39, 91)

## Argument

### I.     The Civil Rights Act of 1866 Prohibits Citizenship and Alienage Discrimination

There is no question but that under applicable precedent, the Civil Rights Act of 1866 as amended in 1870 prohibits citizenship and alienage discrimination.  *See Anderson v. Conboy*, 156 F.3d 167, 169 (2d Cir. 1998).  In order to analyze the application of this law here, it is worth closely examining the history which led up to the 1870 amendments.

Before the amendments of 1870, the Civil Rights Act of 1866 was limited to protection of "*citizens*, of every race and color . . . ."  *Anderson*, 156 F.3d at 172

(emphasis added).  Based on its plain language, the Civil Rights Act at the time did not cover foreign subjects who were here in the United States:

> [A]ll persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right, in every State or Territory of the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person" and property as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding

*People v. Washington*, 36 Cal. 658, 660 (1869) (citation omitted) (emphasis added).

This omission led to a bizarre result in the *Washington* case, a result which is rather shocking to modern sensibilities.  The Defendant in *Washington* was a black individual (Mr. Washington) who had been accused of assaulting and robbing a Chinese subject who was living in California, a Mr. Wang.  (*Id.* at 659).   At the time, the law in California provided that a Chinese subject could not testify in court against a white person.  *Id.* at 659-660.  Significantly, the California law at issue did not contain a general prohibition on all foreign subjects testifying against whites but was limited to Chinese and Mongolian citizens (as well as Native Americans).  *See id.*  In other words, the California law was not a general prohibition on testimony of foreign nationals but rather was limited to two nationalities.  Presumably, for example, subjects of the Kingdom of Prussia or of the Austro-Hungarian Empire who happened to be present in California would not have been not barred from testimony.

Defendant Washington argued that under the Civil Rights Act of 1866 he was entitled to the same rights as white citizens and therefore he should enjoy the same

immunity from the testimony of Chinese people as enjoyed by whites.  *See id.* at 659.
The Court agreed with this reasoning and upheld the dismissal of his indictment.  *See id.*
at 672.

Shortly thereafter, Congress amended the 1866 law to make clear that it protected
not just "citizens" but "persons."  *Anderson v. Conboy*, 156 F.3d 167, 173 (2d Cir. 1998).
This was done in order to "alleviate the plight of Chinese immigrants in California, who
were burdened by state laws restricting their ability to work, removing their right to give
testimony at trial, and otherwise discouraging them from immigrating to and living in
California,"  *Id.*

More than 100 years later, and based on this 1870 amendment, the Second Circuit
held that the Civil Rights Act of 1866 prohibits discrimination based on foreign
citizenship.  *Anderson*, 156 F.3d at 171.  And of course that is the exact situation here:
Bibliotechnical is an Israeli citizen which is legally in New York in much the same way
that Mr. Wang was a Chinese subject who was legally residing in California.
Accordingly, the Civil Rights Act of 1866 applies to and prohibits AUB's conduct.

## II.    Bibliotechnical is Within the Zone of Interests Protected by Section 1981

Even if Bibliotechnical were not considered an Israeli citizen for purposes of this
matter, its claims would still be cognizable under the Civil Rights Act of 1866.  Recent
precedent indicates that when a corporation suffers harm as a result of unlawful
discrimination, it has standing to pursue a Section 1981 claim even if the corporation
itself lacks a racial or citizenship identity.

Thus, for example, in the case of *White Glove Staffing, Inc. v. Methodist Hospitals
of Dallas*, 947 F.3d 301 (5th Cir. 2020), the Fifth Circuit Court of Appeals allowed the

Plaintiff corporation to pursue a racial discrimination claim even though the corporation itself lacked a racial identity.  *Id*. at 306 ("The circuit decisions holding that corporations with imputed racial identities may assert § 1981 claims do not mean that a corporation *must* have a racial identity to assert such a claim.)  The Plaintiff in *White Glove Staffing* was permitted to pursue its claim because it was harmed by discriminatory behavior which was unlawful under Section 1981.

Here too, Bibliotechnical has plausibly alleged that (1) AUB has a practice of unlawfully discriminating against Israelis; and (2) as a result of such unlawful practice Bibliotechnical was injured.  Accordingly, even if Bibliotechnical were not considered an Israeli person within the meaning of the Civil Rights Act of 1866 it would still have a meritorious claim under that law.

Indeed, the Courts have begun to recognize that in discrimination cases, what matters is the discriminator's perception of the victim's membership in a protected category:

> [I]magine a Title VII discrimination case in which an employer refuses to hire a prospective employee because he thinks that the applicant is a Muslim. The employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim. What is relevant is that the applicant, whether Muslim or not, was treated worse than he otherwise would have been for reasons prohibited by the statute.

*Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 571 (3d Cir. 2002).  The same reasoning applies here:  Even if the Court were to find that the Plaintiff is not Israeli in terms of race, citizenship, national origin, or anything else, what matters is that AUB perceived Bibliotechnical to be Israeli and discriminated for this reason.  That alone is sufficient.

### III.    The Civil Rights Act of 1866 Prohibits Discrimination Against Specific Nationalities

AUB attempts to escape liability by arguing that its conduct is solely directed at Israelis and not at other foreign citizens, such as Kuwaitis.  This argument misses a few important points.

First, the plain language of the Act states that "[a]ll persons" must be given the same rights as domestic "citizens."  Bibliotechnical has plausibly alleged that due to its citizenship, it was not given the same rights as would have been accorded a domestic citizen.

Second, the entire point of the 1870 amendment was to protect Chinese citizens as opposed to foreigners in general.  As noted above, presumably any subjects of the Kingdom of Prussia or of the Austro-Hungarian Empire who happened to be in California in 1869 were perfectly free to testify in court in California without limitation.  Before 1870, the laws in California were aimed like a laser at Chinese subjects just as AUB's policies are aimed at Israeli citizens.  It was exactly this type of discrimination which the 1870 amendment was aimed to prevent, viz., discrimination against specific nationalities as opposed to general alienage discrimination.  To be sure, it is reasonable to construe the 1870 amendment also as a prohibition on general alienage discrimination, but limiting Section 1981 to alienage discrimination would be completely missing the point.

Finally, as Judge Forrest correctly pointed out a few years ago, "[a] defendant is not insulated from § 1981 liability for intentional discrimination against some members of a protected class merely because not every member of the class becomes a victim of the discrimination."  *Juarez v. Northwestern Mut. Life Ins. Co.*, 69 F. Supp.2d 364, 370 (S.D.N.Y. 2014).  [A] principal cannot escape liability for unlawful discrimination

against one member of a protected class merely by establishing that it did not discriminate against *every* member of that protected class . . . . *Id*. at 369 (emphasis in original) (citation omitted).

In short, it is abundantly clear based on plain language, legislative history, and common sense that alienage discrimination is illegal even if it is aimed only at one specific category of alien.  Indeed, any other holding would allow the Civil Rights Act of 1866 to be easily circumvented through the simple expedient of strategically picking and choosing which citizenships are acceptable and which are not.

**IV.    There is No Illegality Defense Here**

Just like the Defendant here, the Defendant in *Anderson* presented an illegality defense:  It argued that the Second Circuit's interpretation of the Civil Rights Act would require it to hire illegal aliens.

As a preliminary matter, it should be noted that the illegality defense presented in *Anderson* was much stronger than that presented by AUB:  First, the Defendant in *Anderson* was concerned about the application of American laws to its activities in the United States; as opposed to the application of Lebanese laws to its activities in the United States.  Second, unlike the Defendant in *Anderson*, AUB has the simple option of refraining from offering services in the United States which was exactly the option taken by Kuwait Airlines when confronted with the illegality of its boycott of Israel. *See* Jad Mouawad, *Kuwait Airways Drops Flight to Avoid Israeli Passengers*, N.Y. TIMES, Dec. 18, 2015.

In any event, the Second Circuit in *Anderson* rejected the Defendant's illegality defense, noting that if a New York employer declined to hire someone without proper

work authorization, it would be the lack of work authorization which was the reason for the negative job action as opposed to discrimination on the basis of citizenship. *Anderson* at 180.

Thus, for example, if this Court follows the holding of *Anderson*, AUB would not be required to do business with Iranian companies in violation of American sanctions laws. The reason for rejecting such business would be the sanctions laws themselves and not the person's Iranian citizenship. In any event, as noted previously, Syrian and Iranian sanctions laws are a red herring since they apply to activities in those countries. In other words, they prohibit the provision of services to anyone in Iran or Syria regardless of such person's citizenship or national origin. *See, e.g.* 31 C.F.R. 542.207; 31 C.F.R. 542.405. Any Syrians or Iranians who are legally present in New York have to be treated the same as anyone else.

Moreover, as noted above, AUB would not be in any kind of bind if it were required to follow American law in respect of its American activities. It can simply refrain from offering services in New York which, as noted above, was the option chosen by Kuwaiti Airlines.

Indeed, there are numerous online goods and services which are not offered in various American jurisdictions because the purveyors of those sources are not willing or able to comply with applicable laws.

As another alternative, AUB could simply tell the authorities in Lebanon that it has no choice but to follow American law with respect to services offered in the United States. Presumably the Lebanese authorities are sufficiently enlightened to accept that one of Lebanon's largest private employers is required to follow the laws of the

jurisdictions where it offers services.  In any event, it is clear the sky will not fall if the

Court holds that American law applies to services offered by AUB in this country.

**V.      The Law Applies Even if the Discriminatory Decisions Took Place
In Lebanon**

The case law is clear that for purposes of extraterritoriality, what matters is (1) the

location of the impact of the discrimination; and (2) the location of the Plaintiff itself.

Instructive in this regard is the case of *Ofori-Tenkorang v. American International

Group, Inc.*, 460 F.3d 296 (2d Cir. 2006).  In that case, the Second Circuit explicitly

decided to draw a bright line and held that Section 1981 applied to discrimination which

took place against the Plaintiff if -- and only if -- he was present in the United States at

the time.  Specifically, the Second Circuit held that that "the relevant inquiry is whether

particular acts of discrimination occurred while plaintiff was 'within the jurisdiction of

the United States . . . .'"  *Id.* at 305.  Of course here, Bibliotechnical has alleged that the

act of discrimination took place while Bibliotechnical was within the United States.

Similarly, the New York Court of Appeals has held that the applicability of the

City and State anti-discrimination laws turn on whether the discriminatory conduct has an

"impact" in New York.  *Hoffman v. Parade Publications*, 15 N.Y.3d 285, 290 (2010).

Indeed, the Court of Appeals in *Hoffman* emphasized that the location of the

discriminatory decision is irrelevant:  what matters is where the impact was felt.  *Id.*

This is confirmed by the Defendant's own authorities.  For example, the case of *Hardwick

v. Auriemma*, 116 A.D.3d 465 (1st Dept. 2014) states as follows:

> [I]t is the place where the impact of the alleged discriminatory conduct is felt that
> controls whether the Human Rights Laws apply, not where the decision is made

*Id.* at 467.

Thus, here, if the Defendant's discriminatory decision was made in Lebanon it does not matter at all.  Because the impact of the Defendant's discriminatory behavior was entirely in New York:  It offered remote services to people in New York and denied those services to the Plaintiff on unlawful grounds.  Accordingly, it is clear that the applicable laws apply.

It should also be emphasized that AUB's claim about the location of the discriminatory decision is based on a self-serving affidavit which also contains the dubious insinuation that Bibliotechnical was denied services strictly for reasons unrelated to the fact that it is an Israeli corporation.  Given that AUB appears to have an institutional practice against serving Israelis and given that AUB's headquarters are in New York, it is plausible that the decision was ultimately made in New York.  To the extent that the location of the decision is important, Bibliotechnical is entitled to take discovery on this issue.

## VI.    AUB's Remaining Arguments Lack Merit

AUB's remaining arguments lack merit for the reasons stated on Bibliotechnical's earlier opposition brief the contents of which are incorporated herein by reference. Briefly, Plaintiff has alleged that immediately upon learning that it is an Israeli entity, Defendant locked Bibliotechnical out of its system and refused to communicate further regarding participation in the virtual career fair.  Defendant also states on page 19 of its Memorandum of Law that its employees in Lebanon cannot provide services to an Israeli corporation.  This is more than sufficient to plausibly allege intentional discrimination.

Further, it should be emphasized that New York Executive Law, although framed in terms of "national origin," was enacted for the express purpose of prohibiting exactly

14

the type of discrimination alleged here, i.e. the Arab boycott of Israel.  *See* Maurice Portley, *State Legislative Responses to the Arab Boycott of Israel*, 10 U. MICH. J. LAW REFORM 592 (1977).  For this reason, the words "national origin" in the New York Executive Law should be read to cover Israeli-registered entities notwithstanding interpretations of similar language in Title VI.

Of course the New York City Human Rights law explicitly includes "citizenship" as a protected category.  *See* New York City Human Rights Law Section 8-107(4)(a)(1) Thus, even if the Lisa Law somehow did not apply, the City Law would.

**VII.   Defendant's Motion to Disqualify is Premature at Best**

Because courts must guard against the tactical use of motions to disqualify counsel, such motions are subject to fairly strict scrutiny, particularly motions' under the witness-advocate rule.  *Murray v. Metropolitan Life Insurance Co.*, 583 F.3d 173, 178 (2d Cir. 2009).  The movant, therefore, bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial.  *See id.* (citation omitted).

At this stage, Defendant's concerns are necessarily speculative.  Further, the witness advocate rule applies to trials and is not a bar to participating in pre-trial proceedings.  *See*, *e.g.*, *Interpharm Inc. v. Wells Fargo Nat'l Bank*, No. 08 cv 11365 (S.D.N.Y. Mar. 25, 2010).  Thus, Defendant's motion to disqualify should be denied.

**[continued on next page]**

## Conclusion

For the foregoing reasons, Plaintiff respectfully that Defendant's motion should be denied.  To the extent that the Defendant has made factual submissions to the Court, Plaintiff respectfully requests the opportunity to take discovery and have an evidentiary hearing.  Plaintiff also requests the opportunity, if necessary, to amend the Complaint and correct any deficiencies which could be corrected.

In particular, it appears that the Amended Complaint does not make it 100% clear that all the events underlying Bibliotechnical's allegations took place in Manhattan -- the posting of a job listing; the application to participate in the virtual career fair, etc.  If necessary, Bibliotechnical respectfully requests leave to clarify this isssue.

/s/ David Abrams

David Abrams, Attorney at Law
Attorney for Plaintiff
305 Broadway Suite 601
New York, NY 10007
Tel. 212-897-5821
dnabrams@gmail.com

Dated: May 3, 2021
New York, New York

16